**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| **TRANE U.S. INC. AND TRANE INTERNATIONAL INC.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GARDINER SERVICE COMPANY LLC AND WAIBEL ENERGY SYSTEMS, INC.**<br><br>Defendants. | Case No. _____<br><br>**COMPLAINT**<br><br>**Demand for Jury Trial** |

1.      Plaintiffs Trane U.S. Inc. and Trane International Inc. (collectively "Plaintiffs" or "Trane") bring this action against Defendant Gardiner Service Company LLC ("Gardiner") and Defendant Waibel Energy Systems, Inc. ("Waibel," collectively "Defendants") as a result of Defendants' breach of contract, including through their unauthorized use and transfer of Plaintiffs' confidential and proprietary information.

## PARTIES

2.      Plaintiff Trane U.S. Inc. is a Delaware corporation with its principal place of business at 800-E Beaty Street, Davidson, NC 28036.

3.      Plaintiff Trane International Inc. is a Delaware corporation with its principal place of business at 800-E Beaty Street, Davidson, NC 28036.

4.      Trane U.S. Inc. and Trane International Inc. are 100 percent subsidiaries of Delaware corporation Trane Inc. Trane Inc. is wholly owned by Trane Technologies

Company LLC (formerly known as Ingersoll-Rand Company). Trane Technologies Company LLC was formed in Delaware in 2020 and maintains a principal place of business at 800-E Beaty Street, Davidson, North Carolina 28036. Trane Technologies Company LLC is a wholly owned indirect subsidiary of Trane Technologies plc, a publicly traded company on the New York Stock Exchange. Trane International Inc. licenses and holds intellectual property, and Trane U.S. Inc. is an operating and manufacturing company.

5.  On information and belief, Defendant Gardiner Service Company LLC is an Ohio limited liability company with its principal pace of business in Solon, Ohio.

6.  On information and belief, Defendant Waibel Energy Systems, Inc. is an Ohio corporation with its principal pace of business in Vandalia, Ohio.

## JURISDICTION AND VENUE

7.  Pursuant to 28 U.S.C. §1332(a)(1), this Court has jurisdiction over Plaintiffs' claims, as Plaintiffs and Defendants are citizens of different states, and the amount in controversy exceeds $75,000, excluding interests and costs.

8.  The Court has general and specific personal jurisdiction over Defendants consistent with the requirements of the Due Process Clause of the United States Constitution and the Ohio Long Arm Statute.

9.  The Court has general personal jurisdiction over Defendants because Defendants are citizens of the State of Ohio. Upon information and belief, Defendants are incorporated under the laws of Ohio. Upon information and belief, Defendant Gardiner's

principal pace of business is in Solon, Ohio, and Defendant Waibel has its principal place of business in Vandalia, Ohio.

10.     The Court may exercise specific personal jurisdiction over Defendants because under the terms of contracts between Trane and Defendant Gardiner, and for a period of more than three decades, Defendant Gardiner has conducted business as Plaintiffs' agents in the following counties in the State of Ohio: Lorain, Ashland, Medina, Cuyahoga, Summit, Portage, Geauga, Ashtabula, Trumbull, Lake, Coshocton, Tuscarawas, Harrison, Carroll, Columbiana, Stark, Holmes, Wayne and Mahoning. Defendant Waibel has conducted business as Plaintiffs' agent in the following counties in the State of Ohio: Van Wert, Allen, Mercer, Auglaize, Darke, Shelby, Logan, Miami, Champaign, Preble, Montgomery, Greene, Hardin, and Clark.

11.     On information and belief, Defendants have and continue to direct their activities at residents of Ohio by conducting commercial HVAC sales, services, and/or maintenance in Ohio.

12.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(1)-(2) and 1391(d).

## BACKGROUND

### The Parties' Contracts

13.     On July 1, 1971, Plaintiffs' predecessor (the Trane Company) and Defendant Gardiner's predecessor, William H. Gardiner, Inc., executed a Territorial Franchise

3

Agreement. Plaintiffs incorporate the Territorial Franchise Agreement by reference and refer the Court to Ex. 1 (the "Gardiner Agreement").

14.　　Under the Gardiner Agreement, Plaintiffs' predecessor granted and Defendant Gardiner, through its predecessor, accepted "an exclusive, nonassignable franchise to act as agent for the sale of Trane products" in a specified territory. Ex. 1 §§ 1(a), (b).

15.　　Defendant Gardiner, as Plaintiffs' agent, assumed an obligation to "aggressively promote" Plaintiffs' products and to "work diligently to secure orders" for Plaintiffs' products. *Id.* § 4(a).

16.　　Defendant Gardiner had the right to terminate the Gardiner Agreement on 30 calendar days' notice. *Id.* § 1(c).

17.　　Further, Defendant Gardiner agreed that on termination, it would transfer and deliver to Plaintiffs "all correspondence, completed and outstanding proposals . . . , blueprints, plans, order and sales records and other written information reasonably necessary to carry on the sales in which [Gardiner] has an interest and to carry on the regular business as previously conducted by [Gardiner] . . . , [a]ll literature, stationery, samples, **confidential data and other materials, supplies and equipment which is also property of [Plaintiffs]**." *Id.* §§ 5(d), (e) (emphasis added).

4

18.     Plaintiffs and Defendant Gardiner worked together under the Gardiner Agreement for more than three decades, until April 3, 2017, when Gardiner provided notice of termination under § 1(c) of the Gardiner Agreement.

19.     On January 1, 1989, Plaintiffs' predecessor (the Trane Company) and Defendant Waibel, executed a Sales Representation Agreement. Plaintiffs incorporate the Sales Representation Agreement by reference and refer the Court to Ex. 2.

20.     Under the Sales Representation Agreement, Plaintiffs' predecessor granted, and Defendant Waibel accepted an "exclusive, nonassignable right to act as agent for the sale of [Trane] products" in a specified territory. Ex. 2 §§ I.1, I.3.

21.     Defendant Waibel, as Plaintiffs' agent, assumed a duty of "absolute loyalty" to Plaintiffs. *Id.* § II.3. For example, Waibel agreed that it would not "create or maintain any conflict of interest with [Trane]" either "directly or indirectly, personally or through companies wholly or partially owned or controlled by Agent or Owner-Manager" nor "make any personal profit or gain from [Waibel's] position as Agent except as specifically provided for" in the Agreement. Defendant Waibel further agreed that it would "not market or represent any equipment or products of other suppliers which compete with [Plaintiffs' products] without the prior written approval of [Plaintiffs]." *Id.* The duty of loyalty further provided that "[n]o business opportunity which is relevant to [Trane's] business activities shall be diverted from [Trane] or entered into by [Waibel] without prior written approval of [Trane]." *Id.*

22.    Defendant Waibel, as Plaintiffs' agent, assumed an obligation to "[a]ggressively promote" Plaintiffs' products and to "[w]ork diligently to secure orders" for Plaintiffs' products. *Id.* § IV.1.

23.    Under the Sales Representation Agreement, Defendant Waibel acknowledged that "[a]n important factor in promoting and maintaining a highly respected and competitive name for [Plaintiffs] and a broad acceptance of [Plaintiffs' products] is the maintenance of proper after-sale-support activities and customer service." *Id.* § VI.1. Thus, Defendant Waibel assumed various service obligations. *Id.*

24.    Defendant Waibel had the right to terminate the Sales Representation Agreement on 60 calendar days' notice. *Id.* § IX.1.

25.    Further, Defendant Waibel agreed that on termination, it would transfer and deliver to Plaintiffs "all correspondence, completed and outstanding proposals, blueprints, plans, order and sales records and other written information reasonably necessary to carry on the sales in which [Waibel] has an interest and to carry on the regular business as previously conducted by [Waibel], . . . and all literature, stationery, samples, **confidential data and other materials, supplies and equipment which is property of [Plaintiffs]**." *Id.* § IX.5 (emphasis added).

26.    With the Sales Representation Agreement, Defendant Waibel and Plaintiffs executed a CACD Service Agreement. Plaintiffs incorporate the CACD Service Agreement by reference and refer the Court to Ex. 3 ("Service Agreement").

27. Under the Service Agreement, Defendant Waibel agreed "not to copy, communicate, use to the detriment of Trane or for the benefit of any other person, or misuse in any way" Plaintiffs' confidential, proprietary, or trade secret information. Ex. 3 § VI.1. And under the Service Agreement, all confidential, proprietary, or trade secret information "shall at all times remain the sole property of Trane and shall promptly be returned to Trane upon the termination of this Agreement." *Id.* § VI.2.

28. Defendant Waibel had the right to terminate the Service Agreement on 60 calendar days' notice. *Id.* § V.1.

29. Defendant Waibel and Trane worked together under the Sales Representation Agreement and the Service Agreement until 2021, when Waibel terminated both agreements.

**Plaintiffs' Confidential, Proprietary, and/or Trade Secret Information: Tracer TU**

30. In 2006, Plaintiffs developed their Tracer TU software. The Tracer TU software is a confidential, proprietary, trade secret tool that facilitates and enhances customizing and servicing Trane HVAC products. Plaintiffs and their licensees use Tracer TU across the country for products sold in interstate commerce.

31. Plaintiffs license Tracer TU to authorized users under an End-User License Agreement ("EULA"). Plaintiffs incorporate the relevant EULAs by reference and refer the Court to Exs. 4, 5, 6, and 7 (EULA Revs. N, P, R, and S, respectively). Authorized users install the Tracer TU software on a computer, and a license unlocks the tool's

7

proprietary features. Without a license, or after expiration of a license, users cannot access the tool's proprietary features.

32.     Plaintiffs had granted Tracer TU licenses to Defendants to allow Defendants to sell and service Plaintiffs' products under the respective contracts. The terms of each Tracer TU license held by Defendants were provided in a EULA, to which Defendants agreed when they activated each license. The EULA covering Defendant Gardiner's Tracer TU licenses is provided in Ex. 4 ("Gardiner EULA"), and the EULAs applicable to Defendant Waibel's licenses are provided in Exs. 5, 6, and 7 ("Waibel EULAs").

33.     Plaintiffs retain the right to terminate a Tracer TU license under certain circumstances. The Gardiner EULA, and one of the Waibel EULAs, provide that "this License is effective . . . for a specific computer" and "[i]f the specific computer has a valid Trane commercial account, this License will automatically and immediately terminate with regard to the User upon any change in the affiliation of the User with Trane during the term of the License." Ex. 4, ¶ 2(c) (EULA Rev. N); Ex. 5, ¶ 2(c) (EULA Rev. P). The other two EULAs applicable to Defendant Waibel's licenses similarly provide that "[i]f Customer has a separate agreement with [Trane] that provides for termination of the License and/or return of The Materials upon the occurrence of an event, then [Trane] may terminate the License and/or obtain return of The Materials from Customer, notwithstanding these Terms." Ex. 6 ¶ 10.4 (EULA Rev. R); Ex. 7 ¶ 10.4 (EULA Rev. S).

34. Paragraph 2(d) of the Gardiner EULA and one of the Waibel EULAs further

provides:

> Upon termination of any License, the User agrees to promptly cease all use
> of The Materials and to either return or destroy the Materials, together with
> all copies and merged portions thereof in any form. Should the User fail to
> comply with this subsection (d), the User agrees that the minimum damages
> to Trane for such noncompliance shall be no less than ten thousand US
> dollars ($10,000) per each month of continuing noncompliance.

Ex. 4, ¶ 2(d); Ex. 5, ¶ 2(d). Paragraph 10 of the other two Waibel EULAs includes

an almost identical provision, stating:

> Upon termination of the License, Customer shall promptly cease all use of
> the Material and either return or destroy the Material, together with all copies
> and merged portions thereof in any form. Customer acknowledges that the
> damage to Company for non-compliance with the foregoing is a minimum
> of ten thousand US dollars ($10,000) per month of non-compliance.

Ex. 6 ¶ 10; Ex. 7 ¶ 10.

35. Additionally, under Paragraph 3 of the Gardiner EULA and one of the

Waibel EULAs, "[u]ser shall not resell, rent, lease, sublicense, or otherwise transfer The

Material and/or this License. Use of The Material is limited to use within and in connection

with the User's business operation." Ex. 4, ¶ 3; Ex. 5, ¶ 3. Paragraph 24.2 of the other two

Waibel EULAs include an almost identical prohibition. Ex. 6 ¶ 24.2; Ex. 7 ¶ 24.2.

36. Plaintiffs offer different versions of the Tracer TU software to customers and

to contract partners, with different features and levels of access: the Tracer TU Balancing

Tool (a free offering providing only one feature), the Tracer TU Customer Version, Tracer

TU Complete, Tracer TU Professional, Tracer TU Advanced, Tracer TU Pro-Chiller View,

and Tracer TU Unlimited. Plaintiffs limit access to the highest-end Tracer TU tool, Unlimited, to Trane employees and agents like Defendants.

37.  Tracer TU creates service and diagnostic efficiencies and cost savings for Trane customers and provides additional ways to customize controls and equipment to meet customers' unique needs and preferences.

38.  Plaintiffs have invested and continue to invest significant resources in developing, improving, marketing, and protecting their Tracer TU software.

39.  Plaintiffs protect their Tracer TU software. They provide access to third parties only under license. Licensees must register and receive a unique PC identifier to access the software; the licensee can access the software only from its registered PC. Upon expiration of a license, a user cannot access protected features (i.e., the software reverts to its "free" version). A Tracer TU license does not provide access to the Tracer TU source code or other information that may enable a third party to reverse engineer or copy the software.

40.  The Tracer TU software is confidential, proprietary, trade secret information. If a competitor gained access to the Tracer TU software (Plaintiffs do not grant licenses to competitors), that competitor would secure an unauthorized, unfair competitive advantage and a tool that would enable that competitor to unfairly compete for Plaintiffs' customers and service business.

### Termination of the Decades-Long Relationships

41.     On April 3, 2017, Defendant Gardiner notified Plaintiffs that Gardiner was terminating the Gardiner Agreement. Plaintiffs incorporate Defendant Gardiner's termination letter by reference and refer the Court to Ex. 8. The Gardiner Agreement's 30-day notice period would end May 3, 2017. *See* Ex. 1 § 1(c).

42.     In response, on April 17, 2017, Plaintiffs sent Defendant Gardiner a letter providing that the Gardiner Agreement would terminate at 11:59 p.m. on April 30, 2017. Plaintiffs incorporate the April 17, 2017, letter by reference and refer the Court to Ex. 9.

43.     Pursuant to the Gardiner Agreement, Defendant Gardiner needed to transfer and deliver to Plaintiffs "all correspondence, completed and outstanding proposals . . . , blueprints, plans, order and sales records and other written information reasonably necessary to carry on the sales in which [Gardiner] has an interest and to carry on the regular business as previously conducted by [Gardiner] . . . , [a]ll literature, stationery, samples, confidential data and other materials, supplies and equipment which is also property of [Plaintiffs]." Ex. 1 §§ 5(d), (e).

44.     In the April 17, 2017, letter, Trane provided an additional list of items to be promptly transferred and delivered by Gardiner to Trane due to the termination, including "[a]ll copies of Trane sales representative support materials, including, without limitation all software licensed or otherwise provided by Trane." Ex. 9 ¶ 6, Attachment A ¶ 6.

45.     Further, the April 17, 2017, letter provided that through April 30, 2017, "Gardiner must continue to meet obligations to aggressively promote Trane's products and work diligently to secure orders for the products of Trane, as set forth under Section 4(a) of the [Gardiner] Agreement, as has been Gardiner's obligation throughout the term of the Agreement. Any actions or intentions to act inconsistent with such obligations would impact (and would have impacted) Trane adversely, cause damages to Trane and be contrary to the Agreement." *Id.* ¶ 10.

46.     Following termination of the Gardiner Agreement, Plaintiffs opened an office in Valley View, Ohio to continue the sales and service business that Defendant Gardiner had been operating on Plaintiffs' behalf.

47.     On February 2, 2021, Defendant Waibel notified Plaintiffs that Waibel was terminating its Sales Representation Agreement and Service Agreement. Plaintiffs incorporate Waibel's February 2, 2021, termination letter by reference and refer the Court to Ex. 10.

48.     Subsequently, on March 11, 2021, Plaintiffs and Defendant Waibel entered into a Letter Agreement providing that the Sales Representation Agreement and Service Agreement and "any agency or service representative relationships created thereunder will terminate effective at 11:59 p.m. EST on March 31, 2021." Plaintiffs incorporate the March 11, 2021 Letter Agreement by reference and refer the Court to Ex. 11.

49.     The March 11, 2021, Letter Agreement reiterated that Defendant Waibel needed to "promptly transfer to and deliver to Trane, or any agent it designates, all correspondence, completed and outstanding proposals, sales records, sales office files blueprint, plan and other written information reasonably necessary to carry on the regular business, . . . all literature, stationery, samples, confidential data and other materials, supplies and equipment which are also the property of Trane." *Id.* ¶ 3; Ex. 2 § IX.5; Ex. 3 § VI.2.

50.     Further, the March 11, 2021 Letter Agreement provided that through March 31, 2021, Defendant Waibel "must (i) continue to meet its obligations to aggressively promote Trane's products and work diligently to secure orders for the products of Trane, as set forth under Section IV(1) of the Sales [Representation] Agreement, and (ii) at all times and in good faith abide by and adhere to its "duty of loyalty" as set forth in Section II(3) of the Sales [Representation] Agreement, as has been Waibel's obligation throughout the term of the Agreements." Ex. 11 ¶ 7. "Any actions or intentions to act inconsistent with such obligations would impact (and would have impacted) Trane adversely, cause damages to Trane and be contrary to the Agreements." *Id.*

51.     With the termination of the Sales Representation Agreement and Service Agreement, Defendant Waibel's affiliations with Plaintiffs ended. Upon this change of affiliation with Plaintiffs, Defendant Waibel's Tracer TU licenses, with similar termination

provisions as those in Defendant Gardiner's EULA, terminated. *Compare* Ex. 4 (EULA Rev. N) ¶ 2(c), *with* Ex. 5 ¶ 2(c) (EULA Rev. P).

52.     Further, the termination of the Sales Representation Agreement and Service Agreement obligated Defendant Waibel to transfer and deliver to Plaintiffs "all literature, stationery, samples, confidential data and other materials, supplies and equipment which is property of [Plaintiffs]." Ex. 2 § IX.5; Ex. 3 § VI.2. Since two of the EULAs applicable to Defendant Waibel's Tracer TU licenses provided that "[i]f Customer has a separate agreement with Company that provides for . . . return of The Materials upon the occurrence of an event, then Company may terminate the License and/or obtain return of The Materials from Customer, notwithstanding these Terms," those Tracer TU licenses also terminated upon the termination of the Sales Representation Agreement and Service Agreement. *See* Ex. 6 (EULA Rev. R) ¶ 10.4; Ex. 7 (EULA Rev. S) ¶ 10.4.

53.     Following termination of the Waibel contracts, Plaintiffs opened an office in Dayton, Ohio, to continue the sales and service business that Defendant Waibel had been operating on Plaintiffs' behalf.

54.     After terminating their contracts with Plaintiffs, Defendants, no longer Plaintiffs' agents, continued to operate, now as Plaintiffs' competitors with improper access to Plaintiffs' proprietary software, Tracer TU.

14

**Defendants' Unauthorized Use and Distribution of Tracer TU**

55.     From their internal records, Plaintiffs suspected that Defendants continued to use the Tracer TU software, without authorization, after they terminated their contracts with Plaintiffs.

56.     On information and belief, Defendant Gardiner purchased and maintained access to Tracer TU licenses after it decided to cut ties with Plaintiffs with the intent to use Tracer TU and maintain Gardiner's ability to service customers with Trane products after termination, until Gardiner could transition those customers away from Trane products and capture that service business, in contravention of the Gardiner Agreement and the EULAs applicable to the licenses.

57.     On information and belief, Defendant Gardiner exchanged letters with one of Plaintiffs' former independent sales offices, William A. Harrison, Inc., to devise this scheme of unauthorized access and use of the Tracer TU software. Notably, on September 17, 2021, the U.S. District Court for the Eastern District of Texas found similar conduct by William A. Harrison, Inc. constituted a breach of the Tracer TU EULAs on summary judgment. *See Trane U.S. Inc. et al. v. William A. Harrison, Inc. et al.*, No. 5:20-CV-00084, Dkt. 202, at 10-15 (E.D. Tex. Sept. 17, 2021). The EULA binding Defendant Gardiner is the same as the EULA that William A. Harrison, Inc. breached.

58.     Based on internal records, Plaintiffs determined that Defendant Gardiner had purchased and activated at least thirty-one (31) Tracer TU licenses in late April and May

2017, on the eve of termination of the Gardiner Agreement. Each of these licenses was bound by the terms a EULA, as referenced in Ex. 4, which terminated upon termination of the Gardiner Agreement.

59.    Of these thirty-one licenses, two (2) were 3-year Tracer TU Pro-Controls licenses that Defendant Gardiner activated on April 26 and May 8, 2017, respectively. Based on Trane's internal records, Defendant Gardiner's post-termination unauthorized access and use of these Tracer TU Pro-Controls licenses continued for 36 and 37 months respectively.

60.    Twenty-six (26) of the thirty-one licenses that Defendant Gardiner obtained after sending its termination letter were Tracer TU Unlimited licenses. These licenses were activated on various dates between April 3, 2017, when Gardiner notified Plaintiffs of termination, and April 30, 2017, the effective date of termination as provided in Trane's April 17, 2017, letter. Based on Trane's internal records, the unauthorized access and use of these Tracer TU Unlimited licenses continued for a combined total of 311 months across the twenty-six licenses.

61.    Three (3) of the thirty-one Tracer TU licenses that Defendant Gardiner purchased after providing notice of its termination were Tracer TU Professional licenses. Defendant Gardiner activated these Tracer TU Professional licenses between May 8-9, 2017, after the effective date of termination on April 30, 2017.  Based on Trane's internal

records, the unauthorized access and use of these Tracer TU Professional licenses continued for a combined total of 87 months across the three licenses.

62.     On information and belief, when the three Tracer TU Professional licenses expired in May 2018 and May 2020, respectively, Defendant Gardiner subsequently purchased at least three (3) additional copies of Tracer TU Professional from Defendant Waibel. These three additional licenses were activated on May 15, 2020, with the assistance of Defendant Waibel.

63.     On information and belief, and based on conversations with Defendant Waibel's former employees, Defendant Waibel also continued using the Tracer TU software after Plaintiffs and Defendant Waibel executed the Letter Agreement on March 11, 2021, providing for termination of Defendant Waibel's contracts with Plaintiffs on March 30, 2021, at which time Defendant Waibel's Tracer TU licenses expired.

64.     Plaintiffs discovered from their internal records that, after the termination of Waibel's Sales Representation Agreement and Service Agreement with Plaintiffs on March 31, 2021, Defendant Waibel had maintained unauthorized access to at least ten (10) Tracer TU licenses, of which eight (8) were Tracer TU Pro Chiller View licenses, and two (2) were multiyear Tracer Professional licenses. Each of these licenses was bound by the terms of a EULA, as referenced in Ex. 7 (EULA Rev. S), which terminated upon termination of the Sales Representation Agreement and Service Agreement. Defendant Waibel's post-

termination unauthorized access and use of the Tracer TU Pro Chiller View and Tracer Professional licenses continued for 139 and 59 months, respectively.

65. Defendant Waibel also purchased and activated at least twenty-nine (29) additional Tracer TU Unlimited licenses on various dates between April 2020 and March 2021 before termination. Defendant Waibel's unauthorized access and use of these licenses continued for a combined total of 215 months across the twenty-nine Tracer TU Unlimited licenses. At least one (1) Tracer TU Unlimited license was activated by Defendant Waibel after termination on March 18, 2021. Defendant Waibel continued to access and use this license for twelve months without Plaintiffs' authorization. Each of these Tracer TU Unlimited licenses was bound by the terms of a EULA, as referenced in Exs. 6 and 7 (EULA Revs. S and R, respectively), which terminated upon termination of the Sales Representation Agreement and Service Agreement.

66. Based on Plaintiffs' internal records, Defendant Waibel improperly stacked and added three (3) Tracer TU Unlimited licenses to a computer that did not require new licenses before termination of their contracts on March 31, 2021. Each of these licenses was bound by the terms of a EULA, as referenced in Exs. 5 and 7 (EULA Revs. S and P, respectively), which terminated upon termination of the Sales Representation Agreement and Service Agreement. These improperly stacked Tracer TU Unlimited licenses remained active post-termination, for a combined total of 51 months across the three licenses.

67.     On information and belief, Defendant Waibel sold three 3-year Tracer TU Professional licenses to Defendant Gardiner three years after termination of the Gardiner Agreement when Gardiner was no longer Plaintiffs' agent, in contravention of the operative EULA. *See* Ex. 7 ¶ 24.2. Since Defendant Gardiner's business is not limited to the territory within which Defendant Waibel was authorized to act as Plaintiffs' agent, Defendant Waibel's sale of the Tracer TU licenses to Defendant Gardiner also violated the territorial limitations of the Sales Representation Agreement and the Service Agreement. *See* Ex. 2 §§ I.1, I.3, II.3; Ex. 3 § I.1. Defendant Waibel, despite being bound by its duty of absolute loyalty as a Trane independent sales office, assisted Defendant Gardiner to activate and begin using these licenses on May 15, 2021, without Plaintiffs' authorization.

68.     On information and belief, Defendant Waibel purchased, activated, and accessed the Tracer TU licenses after it decided to cut ties with Plaintiffs with the intent to use Tracer TU and maintain Waibel's ability to service customers with Waibel products after termination, until Waibel could transition those customers away from Trane products and capture that service business, in contravention of the parties' contracts.

69.     On information and belief, and based on conversations with Defendant Waibel's former employees, Defendant Waibel also promoted Plaintiffs' competitor's controls over Trane's Tracer controls and tried to hold onto business that should have transferred to Plaintiffs after termination by working to sell products that compete with Plaintiffs' products to its customers, while still Plaintiffs' agent and under a duty of loyalty.

70.    The Sales Representation Agreement imposed on Defendant Waibel a duty of absolute loyalty to "not market or represent any equipment or products of other suppliers which compete with [Plaintiffs'] Products" and to not divert any "business opportunity which is relevant to [Plaintiffs'] business activities. Ex. 2 § II.3.

71.    On information and belief, despite being bound by its duty of absolute loyalty, Defendant Waibel sold very few Trane Tracer controls and instead promoted a competitor, Tridium, as the controls platform in direct contravention of the parties' agreements.

72.    On information and belief, had Defendant Waibel promoted and installed the Tracer controls as required by the Sales Representation Agreement, Defendant Waibel would not have been able to service those customers without Plaintiffs' Tracer TU software.

73.    As a result of Defendant Waibel's conduct diverting business opportunities away from Plaintiffs, when Plaintiffs opened an office in Dayton, Ohio, to continue the sales and service business that Defendant Waibel had been operating on Plaintiffs' behalf, Plaintiffs found very few opportunities to sell Trane controls as the market was saturated with Tridium, and customers had minimal knowledge of Trane Controls.

74.    On information and belief, Defendants' improper access to and use of Tracer TU software breached their agreements with Plaintiffs and enabled Defendants to unfairly compete against Plaintiffs. Without continued access to the Tracer TU licenses, Defendants

20

would not have been able to service Trane Tracer controls after Defendants' contracts with Plaintiffs terminated. On information and belief, by continuing to improperly access and use Plaintiffs' proprietary Tracer TU software, Defendants were able to unfairly compete with Plaintiffs in servicing Tracer controls. Defendants, by failing to return and destroy their unauthorized Tracer TU licenses, secured an unfair competitive advantage and a tool that enabled them to unfairly compete for Plaintiffs' customers and service business, depriving Plaintiffs of legitimate customers and service business.

## COUNT I

### Against Defendant Gardiner
### Breach of Contract – Territorial Franchise Agreement, Wisconsin State Law

75.    Plaintiffs reallege and incorporate the allegations in paragraphs 1-74.

76.    Plaintiffs and Defendant Gardiner executed a Territorial Franchise Agreement on July 1, 1971. That contract remained in effect through April 30, 2017.

77.    Plaintiffs performed their obligations under the Territorial Franchise Agreement in good faith.

78.    Defendant Gardiner breached at least sections 5(d) and 5(e) of the Territorial Franchise Agreement when it refused to transfer and deliver its copies of Tracer TU to Plaintiffs and when it continued to use Tracer TU after termination of the Territorial Franchise Agreement, without Plaintiffs' authorization.

79.     Defendant Gardiner's breach damaged Plaintiffs, including but not limited to lost revenues, profits, business opportunities, damage to reputation, and other damage in an amount to be proven at trial.

## COUNT II

### Against Defendant Gardiner
### Breach of Contract – EULA, New Jersey State Law

80.     Plaintiffs reallege and incorporate the allegations in paragraphs 1-79.

81.     Plaintiffs and Defendant Gardiner executed a EULA for every Tracer TU license Defendant Gardiner obtained.

82.     Plaintiffs performed their obligations under the EULA in good faith.

83.     Defendant Gardiner breached at least paragraph 2(d) of its EULA when it refused to return and destroy its copies of Tracer TU and when it continued to use Tracer TU after termination of the EULA, without Plaintiffs' authorization.

84.     Defendant Gardiner's breach damaged Plaintiffs, including but not limited to lost revenues, profits, business opportunities, damage to reputation, and other damage in an amount to be proven at trial.

## COUNT III

### Against Defendant Waibel
### Breach of Contract – Sales Representation Agreement, Wisconsin State Law

85.     Plaintiffs reallege and incorporate the allegations in paragraphs 1-84.

86.     Plaintiffs and Defendant Waibel executed a Sales Representation Agreement on January 1, 1989. That contract remained in effect through March 31, 2021.

87.     Plaintiffs performed their obligations under the Sales Representation Agreement in good faith.

88.     Defendant Waibel breached the Sales Representation Agreement when it refused to transfer and deliver its copies of Tracer TU to Plaintiffs and when it continued to use Tracer TU after termination of the Sales Representation Agreement, without Plaintiffs' authorization.

89.     Further, Defendant Waibel breached the Sales Representation Agreement by violating the duty of absolute loyalty it owed to Trane. Defendant Waibel was contractually obligated to neither directly nor indirectly, personally or through companies wholly or partially owned or controlled by Waibel, create or maintain any conflict of interest with Trane, or make any personal profit or gain from its position as Trane's agent, except as specifically provided for in the Sales Representation Agreement. Defendant Waibel was further obligated not to divert or enter into any business opportunity relevant to Trane's business activities without prior written approval of Trane. Defendant Waibel  breached these obligations through its promotion of Trane's competitor Tridium's products without Trane's knowledge or approval.

90.     Defendant Waibel breached the territorial limitations of the Sales Representation Agreement by selling three Tracer TU Professional licenses to Defendant Gardiner without Plaintiffs' authorization.

91.     Defendant Waibel's breach damaged Plaintiffs, including but not limited to lost revenues, profits, business opportunities, damage to reputation, and other damage in an amount to be proven at trial.

## COUNT IV

**Against Defendant Waibel**
**Breach of Contract – CACD Service Agreement, Wisconsin State Law**

92.     Plaintiffs reallege and incorporate the allegations in paragraphs 1-91.

93.     Plaintiffs and Defendant Waibel executed a CACD Service Agreement on January 1, 1989. That contract remained in effect through March 31, 2021.

94.     Plaintiffs performed their obligations under the CACD Service Agreement in good faith.

95.     Defendant Waibel breached the CACD Service Agreement when it refused to transfer and deliver its copies of Tracer TU to Plaintiffs, continued to use Tracer TU after termination of the Service Agreement, and sold the three Tracer TU Professional licenses to Defendant Gardiner—all without Plaintiffs' authorization.

96.     Defendant Waibel's breach damaged Plaintiffs, including but not limited to lost revenues, profits, business opportunities, damage to reputation, and other damage in an amount to be proven at trial.

## COUNT V

**Against Defendant Waibel**
**Breach of Contract – EULA, New Jersey State Law**

97.     Plaintiffs reallege and incorporate the allegations in paragraphs 1-96.

98.     Plaintiffs and Defendant Waibel executed a EULA for every Tracer TU license Defendant Waibel obtained.

99.     Plaintiffs performed their obligations under the EULAs in good faith.

100.    Defendant Waibel breached the EULAs when it refused to return and destroy its copies of Tracer TU, continued to use Tracer TU after termination of the EULAs, and sold the three Tracer TU Professional licenses to Defendant Gardiner—all without Plaintiffs' authorization.

101.    Defendant Waibel's breach damaged Plaintiffs, including but not limited to lost revenues, profits, business opportunities, damage to reputation, and other damage in an amount to be proven at trial.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court enter judgment:

1.      Finding Defendants jointly and severally liable on all counts.

2.      Finding that Plaintiffs suffered, and continue to suffer, irreparable harm.

3.      Enjoining Defendants from violating their legal and contractual duties to Plaintiffs and from using Plaintiffs' confidential and proprietary information.

4.      Awarding Plaintiffs their actual and compensatory damages, including direct, incidental, liquidated, and consequential damages, in amounts to be proven at trial.

5.      Awarding Plaintiffs exemplary and punitive damages.

6.      Awarding Plaintiffs their attorneys' fees and costs.

7.      Awarding Plaintiffs prejudgment and post-judgment interest.

8.      Awarding Plaintiffs such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable, pursuant to Federal Rule of Civil Procedure 38.

Dated: October 18, 2022                    Respectfully submitted,


                                           */s/ Michael J. Garvin*

                                           Michael J. Garvin (0025394)
                                           **VORYS, SATER, SEYMOUR AND PEASE
                                           LLP**
                                           200 Public Square, Suite 1400
                                           Cleveland, Ohio 44114-2327
                                           Tel: (216) 479-6100
                                           Fax:  (216-479-6060)
                                           mjgarvin@vorys.com

                                           Cyrus A. Morton (*pro hac vice* to be submitted)
                                           MN Bar No. 0287325
                                           John K. Harting (*pro hac vice* to be submitted)
                                           MN Bar No. 0392234
                                           Rajin S. Olson (*pro hac vice* to be submitted)
                                           MN Bar No. 0398489
                                           Akina R. Khan (*pro hac vice* to be submitted)
                                           MN Bar No. 0401835
                                           **ROBINS KAPLAN LLP**
                                           800 LaSalle Avenue, Suite 2800
                                           Minneapolis, MN 55402
                                           Tel: (612) 349-8500
                                           Fax: (612) 339-4181
                                           CMorton@RobinsKaplan.com
                                           JHarting@RobinsKaplan.com
                                           ROlson@RobinsKaplan.com
                                           AKhan@RobinsKaplan.com

                                           **Attorneys for Plaintiffs Trane U.S. Inc. and
                                           Trane International Inc.**